IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 7, 2019

## STATE OF TENNESSEE v. LACURTIS ODOM

**Appeal from the Criminal Court for Shelby County**
No. 16-04863     John Wheeler Campbell, Judge

### No. W2018-01448-CCA-R3-CD

The Defendant, LaCurtis Odom, was indicted on one count of premeditated first degree murder, a Class A felony; one count of first degree felony murder, a Class A felony; one count of theft of property valued at more than $1,000, a Class D felony; one count of criminal attempt to commit especially aggravated robbery, a Class B felony; and one count of unlawful possession of a handgun by a convicted felon, a Class E felony. See Tenn. Code Ann. §§ 39-12-101, -13-202, -14-103, -17-1307. Following a jury trial, the Defendant was convicted as charged. The trial court imposed a total effective sentence of life plus eighteen years, twelve years of which were to run consecutively to the Defendant's sentence in a previous case. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his convictions for premeditated first degree murder, felony murder, and attempted especially aggravated robbery; (2) that relative to the murder charges, the trial court failed to instruct the jury on the lesser-included offense of reckless homicide; and (3) that the trial court erred by imposing consecutive sentencing. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Jessica L. Gillentine, Bartlett, Tennessee, and Alexander D. Camp, Jackson, Tennessee (on appeal); and Charles W. Gilchrist, Jr. (at trial), Memphis, Tennessee, for the appellant, LaCurtis Odom.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kirby May and Nicole Germain, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND[1]

This case arises from the July 30, 2016 shooting death of the victim, Terralonce Stanford, which occurred while the victim was attempting to recover his stolen car.

At trial, the parties stipulated to the Defendant's prior felony conviction for forgery. The parties also stipulated to the Tennessee Bureau of Investigation firearm analysis report on a Jimenez Arms 22-caliber pistol and two .40-caliber Smith and Wesson cartridge casings recovered at the crime scene. The .22-caliber pistol was in "normal operating condition with the safety feature functioning." The pistol's serial number had been "obliterated" but, when restored, revealed no records in the National Crime Information Center (NCIC) database. Both .40-caliber cartridge casings were determined to have been fired by the same unknown firearm, although the analyst noted that the "[c]lass characteristics" on the cartridge casings were most common in Glock pistols.

Sharon Williams, the victim's mother, testified that at the time of his death, the victim was living with his girlfriend, Laeisha Gray, in Memphis and that he owned a gold 1997 Infiniti. The car was a gift from the victim's father. Ms. Williams identified the victim in an autopsy photograph.

Memphis Police Officer SirCrease Brooks testified that on July 9, 2016, around 7:15 a.m., he responded to a call from the victim reporting that his car had been stolen. When Officer Brooks arrived at the victim's apartment complex, the victim gave him the car's license plate number and description. The victim related that he had arrived home from a trip to Mississippi the previous evening and that the "majority" of the victim's belongings were in the car, including his wallet, "his cards," a safe, and clothing. Officer Brooks noted that the victim was "p---ed off" because the victim disconnected the car battery in an effort to prevent its theft, but it had nonetheless been stolen. Officer Brooks described the victim as being "hot," "steaming," and "real mad." Officer Brooks stated that he sent the stolen vehicle report to the NCIC and that he did not investigate further. After reviewing his report, Officer Brooks identified the car's vehicle identification number (VIN) and license plate number. The car was a light gold 1997 Infiniti I30 sedan valued at $2,500.

On cross-examination, Officer Brooks testified that he verified the car had not been towed by the apartment complex. He acknowledged that cars were sometimes stolen by individuals who towed them away. The victim told Officer Brooks that he had

---

[1] We have reordered the witnesses for clarity.

just moved to Tennessee and that some of his belongings were in his "lady friend['s]" apartment, whereas others were in the car. The victim also told Officer Brooks that he had been "down here" a couple of nights.

Laeisha Gray testified that at the time of the victim's death, they had been in a romantic relationship for six years. They met in Mississippi and moved to Memphis in 2014, where they shared an apartment. The victim had a gold Infiniti, which was a gift from his father. The victim had installed a radio and new seat covers in the car, and Ms. Gray agreed that the car was important to the victim. The victim eventually got a Chevrolet S10 truck and began to drive the truck more than the car. Ms. Gray typically drove the car to work. On July 9, 2016, they discovered that the car had been stolen from their apartment parking lot. After they confirmed that the car had not been towed, the victim called the police and reported the theft around 7:00 a.m. before he left for work.

On July 30, 2016, around 9:30 p.m., Ms. Gray and the victim were going to her uncle's house in the victim's truck when the victim took a wrong turn. As he turned around in an apartment complex parking lot, the victim spotted his car. The victim exited the truck, checked the license plate number on the car, and called the police. The truck's windows were halfway down, and Ms. Gray was sitting in the passenger seat, which was parked facing the car. A man and his wife were outside in the parking lot working on a different car, and the victim asked the man for the apartment complex's address as he called the police. Ms. Gray noted, though, that she could not hear the conversation between the man and the victim. The victim stood near the car as he was on the telephone with the police, and a young man, later identified as the Defendant, and "quite a few" people came outside. The Defendant and another man later identified as Montrell Clark[2] walked downstairs; Mr. Clark stayed at the bottom of the stairs while the Defendant walked over to the car.

Ms. Gray testified that as the Defendant came down the stairs, the Defendant asked the victim what he was doing. The victim responded that the car had been reported stolen and that he was on the telephone with the police. The victim was holding his cell phone in his left hand. The Defendant told the victim that "he was fixing to get in the car, and [the victim] told him he couldn't let him get in the car." Both men took two steps away from the car, and the Defendant pointed a black gun at the victim. When asked what the victim was doing with his right hand, Ms. Gray responded that his right hand was by his side and empty. The victim backed away from the car and told the Defendant, "Please don't shoot me," but the Defendant shot the victim. The Defendant was three to four feet away from the victim, and both men stood on the driver's side of the car. Ms. Gray estimated she was ten to fifteen feet from the shooting. Ms. Gray only

---

[2] Mr. Clark was tried separately from the Defendant.

heard one gunshot and thought the victim fell on his back, although she could not see him on the ground from her vantage point.

The Defendant entered the driver's side of the car and Mr. Clark entered the passenger's side. Ms. Gray climbed into the truck's driver's seat and moved the truck backward in order to prevent the Defendant from backing into the truck. The Defendant quickly pulled away in the car. Ms. Gray noted, though, that the Defendant returned on foot and bent over the victim's body for about twenty seconds. Ms. Gray did not see what the Defendant did. When the Defendant heard police sirens, he "took off running." Two or three minutes later, the police arrived. Ms. Gray stayed to be interviewed, and the following day, she identified the Defendant as the shooter and Mr. Clark as his companion. Ms. Gray noted that she was unacquainted with the people at the apartment complex before this incident and that she had never before been to those apartments.

On cross-examination, Ms. Gray testified that when they were in the apartment complex parking lot, the victim told her, "That look[s] like my car." The victim said that he was going to go get an address for the police. Ms. Gray stated that the victim did not generally carry a pistol and that she did not see him with one that evening. She said that the victim was right-handed, although she did not know with which hand he would shoot a gun. She denied that she and the victim went shooting together. Ms. Gray said that "it wasn't that dark" and that the parking lot was illuminated by light posts and porch lights. She agreed that the truck had tinted windows and that she observed the incident through the tinted windows. She noted, though, that the windshield was not tinted, only the side windows, and that the side windows were halfway down. Ms. Gray estimated that the victim walked about thirty feet to speak to the man who was working on his car and that the two men spoke for about one minute. Ms. Gray denied that the victim said "he was going to get his car back that night no matter what." She also denied that they had seen the victim's car at another location and had followed it to the apartment complex.

Ms. Gray testified that after she backed up the truck following the shooting, she did not move it again. Ms. Gray did not know if the Defendant stood over the victim's body or to the side of it when he returned on foot. She acknowledged that it was dark and that she was in the truck's driver's seat, which was farther from the victim than she had been at the time of the shooting. Ms. Gray denied that the victim and the Defendant had physical contact or "tussle[d]." She also denied that the victim "made a movement to his pocket area" with his right hand or pulled out a gun. Ms. Gray stated that she was too afraid to check on the victim and that she waited for the police to arrive. She noted that she was five months pregnant at the time of the shooting. Ms. Gray gave a statement to police after the shooting and told them that the victim owned a small black gun. Ms. Gray did not know the gun's manufacturer or caliber, only that it was small. Ms. Gray agreed that she had told the police that the victim "had a gun." She said, though, that he

generally only had the gun at home and did not carry it in public. Upon reviewing a photograph of the gun recovered at the crime scene, Ms. Gray stated that the gun was the type of gun the victim owned.

On redirect examination, Ms. Gray testified that when she gave her police statement, the police did not show her the gun found near the victim or photographs of it. She denied seeing the victim's gun before or during the shooting.

Memphis 9-1-1 operator Tondra Hailey testified that on July 30, 2016, at 9:20 p.m., her records indicated that the victim called 9-1-1 and spoke to another operator. At 9:31 p.m., the victim called 9-1-1 again and spoke to Ms. Hailey. Ms. Hailey called the victim back at 9:34 p.m. because the address the victim had given was not reflected by her system's approximation of his location. During that second call, Ms. Hailey was unable to obtain better information because the victim began speaking to someone else. Ms. Hailey updated her communication to police dispatch using the system's approximation of the victim's location. She was eventually able to discern the victim's location at Hickory Hills Apartments because a third party called 9-1-1 regarding the same incident. The first officer arrived on the scene at 9:38 p.m.

The 9-1-1 recording was played for the jury and reflected two calls. In the first call, the victim asked for police to come to an address on "Hickory Hill."[3] He told Ms. Hailey that his car had been stolen, that he had it "blocked in," and that he needed the police to come quickly. He gave the car's description and license plate number. In the second call, the victim stated that he had keys to the stolen car and was trying to get into it. Ms. Hailey attempted to interrupt the victim to ask him a question. The victim said to someone else, "Please don't shoot me, bro," and sounded increasingly urgent or panicked as he repeated the phrase several more times. The victim's voice, still repeating the phrase, grew quieter as if he were moving away from the telephone, and the line went silent. Ms. Hailey stated that after the last call, she informed the police that "apparently someone [was] armed" and that the victim had encountered "some people" around the car.

Memphis Police Officers Dexter Walker, Jeffrey Alan Garey, and Dartelle Joyner; Crime Scene Investigator Marcus Mosby; Detectives Richard Hillyard and Mark Ward; and Sergeant Michael Chipman testified regarding their respective roles in the investigation. The officers responding to the crime scene found the victim's body lying on the ground face-up with a cell phone in his left hand. The victim had been shot in the head and had abrasions on his forehead. Crime scene photographs showed that a small black handgun was next to the victim's left arm with the barrel pointing away from the victim's body at a perpendicular angle. The gun was positioned such that the bottom of

---

[3] Hickory Hill was also the name of a street not in the vicinity of Hickory Hills Apartments.

the handle was facing the victim's left shoulder. Multiple officers opined that the positioning of the gun was unusual, and Officer Walker noted that if the victim had been holding the gun in his right hand, when he fell, the "butt" of the gun would have landed facing toward the victim's shoe. Investigator Mosby noted that if the victim "supposedly" held the cell phone and the gun in the same hand, it was "odd" that the victim did not drop both items; he said, though, that if the victim held the gun in his right hand when he fell and had been turned over afterward, he could have dropped the gun.

The victim's right shoe was on the victim's left side on the ground, which officers hypothesized indicated that the victim had fallen at an angle or had been turned over before police arrived. The victim's right pants pocket was turned out as if someone had gone through the victim's pants "to take objects out." Two spent cartridge casings of the same type, a cell phone, and a "Jimenez handgun" were collected from the crime scene. The pistol was loaded.

A truck was parked "not too far from the body," and Ms. Gray was standing near the truck. Officer Walker noted that Ms. Gray "didn't seem distressed." The only other person in the parking lot was a man later identified as Larry Lawson, who had reported the shooting to police. "[S]ome women" were standing on the second floor balcony of the building and went inside as the police arrived. Two of the women, JaQuila Banks and Brittany Shoemaker,[4] were interviewed, and as a result of those interviews, the Defendant and Mr. Clark were identified as suspects.

Later that night around 4:00 a.m. on July 31, officers responded to a vehicle. The car, a 1997 Infiniti, was in an open field and had been "completely burned" such that the dashboard had melted onto the floor and all that remained of the seats were metal springs. The car had three Infiniti hubcaps and one Nissan hubcap; no latent fingerprints were recovered. The VIN was still legible and matched the victim's car. After searching unsuccessfully for the Defendant and Mr. Clark for one month, indictments were obtained; the Defendant was eventually arrested in July 2017.

Larry Lawson testified that in July 2016, he was staying at Hickory Hills Apartments with his daughter-in-law. On July 30 around 9:00 p.m., he was working on his daughter-in-law's car in the parking lot when he saw a man drive into the parking lot in a gold "four-door car." The man and a male passenger exited the car and went into an apartment on the second floor. About ten or fifteen minutes later, Mr. Lawson saw a man, later identified as the victim, enter the parking lot in a truck and pull in front of the car to block it in. The victim exited the truck and approached Mr. Lawson. The victim

---

[4] Brittany Shoemaker and her sister, Mary Shoemaker, both testified in this case. For clarity, we will refer to them by their first names. We intend no disrespect in so doing.

had called the police and had them on speaker phone; he asked Mr. Lawson for the name of the apartment complex, which Mr. Lawson gave him. The victim stayed with Mr. Lawson "a few more minutes" and told Mr. Lawson that "he had followed his car that somebody had stolen. And he told [Mr. Lawson] he had them blocked in." The victim also stated that he had extra keys to the car and asked Mr. Lawson if he should "go down there and get in it." Mr. Lawson advised the victim to wait for the police to arrive.

Eventually, the victim walked back toward the gold car and opened the driver's side door. A few minutes later, Mr. Lawson saw "the guys" and a woman come out onto the second-floor balcony. Mr. Lawson believed that the first man to exit the apartment was the shooter.[5] Mr. Lawson stated that the shooter ran down the stairs and confronted the victim, who was standing in the open door of the gold car. The victim and the shooter were about four or five feet apart. The shooter told the victim to move away from the car, and the victim refused, stating that it was his car and that the police were on their way. The shooter responded, "No, this ain't your car. Move away from it." The victim reiterated that the police were on their way and that he wanted his car. The shooter "pulled out something," although Mr. Lawson did not see a gun, and the victim asked, "What [are] you fixing to do? Shoot me?" The two men "mumbled" a few words to one another, and the shooter fired at the victim. Mr. Lawson heard two shots in quick succession. The victim fell "like he was dead." Mr. Lawson noted that it looked like the victim had put up his hands and that the victim fell backward.

Mr. Lawson testified that the shooter entered the passenger side of the gold car, and his companion entered the driver's side. The two men demanded that "the girl" move the truck. Mr. Lawson thought that this was the woman who left the apartment with the shooter and his companion. He stated that the woman was standing outside when the victim was shot. The woman moved the truck, and the gold car backed out and drove past Mr. Lawson. Mr. Lawson was considering whether to check on the victim and whether the shooter and his companion would return when the shooter came back on foot, walked past Mr. Lawson, and stood near the victim's body. The shooter "straddled over" the victim[6] and patted down his body. Mr. Lawson noted that the shooter "went in [the victim's] pocket[.]" The shooter jogged away, passing Mr. Lawson again. Mr. Lawson was afraid of being shot if he stared at the shooter and noted that the incident was so traumatic that he could not remember the shooter's face. Mr. Lawson identified in photographs of the scene where the shooter and his companion parked, the apartment

[5] Mr. Lawson was not able to identify the men he saw to police. For clarity, we will refer to the first man to exit the apartment as "the shooter" and the other man as "the shooter's companion."

[6] Mr. Lawson mistakenly referred to the victim as "the shooter" in this part of the testimony, but it is clear from context that he meant to refer to the victim.

they entered, and the location of the victim's truck.  Mr. Lawson could not tell if the victim had a passenger in the truck when he arrived at the apartment complex.

On cross-examination, Mr. Lawson testified that six or seven cars were in the parking lot at the time of the shooting.  He agreed that it was dark outside and estimated he was fifty feet away from the gold car.  Mr. Lawson said that the parking lot was illuminated by lamp posts and porch lights.  He noted that he paid attention to the conversation between the victim and the shooter because the victim had told Mr. Lawson the car was stolen.  Mr. Lawson "knew it was something going wrong," and he was attentive to the men "just in case [there] was going to be a shoot-out."

Mr. Lawson denied that the victim mentioned having a gun, stating that the victim only told Mr. Lawson he had an extra key to the car.  Mr. Lawson reiterated that the victim spoke to him, walked toward the gold car, seemed to be speaking on his cell phone, and opened the car door.  A few moments later, the two men came down from the second-floor apartment.  Mr. Lawson denied that the victim and the shooter "tussl[ed]" or touched one another.  Mr. Lawson stated that the closest the men came to one another was when the shooter walked up to the car door.  The shooter stood on the opposite side of the car door from the victim as they spoke.  The shooter's companion opened the passenger-side front door of the car.  As the victim and the shooter spoke, Mr. Lawson saw the victim "back up a few steps" such that he was standing near the trunk of the car.  The shooter "had stepped in front of the doorway of the door that was open."

Mr. Lawson testified that although he could tell the shooter had something in his hand, he did not see a gun.  He said, though, that he saw a flash and that when the victim fell, he knew the shooter had been holding a gun.  Mr. Lawson clarified that the victim turned "like if he was going to run" and described the victim's fall as "on his face.  Side. I guess like the side, you know, because he tried to turn."  Mr. Lawson stated that once the victim fell, his face was to the side, but he was otherwise "flat on his face" with his stomach on the ground.  Mr. Lawson did not see anything in the victim's hand other than his cell phone, which was illuminated.  The victim did not move after he fell, although Mr. Lawson also described that the victim "fell and rolled over."

Mr. Lawson testified that he saw the shooter and "the girl" have a conversation. Although he did not hear what was said, he thought that the shooter "might have" told her to move the truck.  The woman ran to the truck and moved it.  Mr. Lawson agreed that two years after the incident, he did not remember what exactly was said.

On redirect examination, Mr. Lawson testified that he did not know any of the people involved in the incident.  He stated that when the victim backed away from the gold car, he went toward the truck and said, "What?  You going to shoot me?" before he was shot.

JaQuila Banks testified that on July 30, 2016, she was at her "god-sister" Brittany Shoemaker's apartment with Brittany, two women named Mary and "Brea," and several children. The women were doing one another's hair around 9:00 or 10:00 p.m. when there was a knock at the door. The women were not expecting visitors. One of the women opened the door, and the Defendant and two of his friends entered. Ms. Banks knew the Defendant and his "god-brother," who was named Darion, but the third man was unknown to her. Ms. Banks had known the Defendant for three or four years.

Ms. Banks testified that the Defendant and Brittany went into the back of the apartment and that she overheard a conversation between them. Brittany asked the Defendant how he traveled to her apartment, and he responded that he came in his car. Brittany asked if the car was stolen. The Defendant responded negatively. Brittany returned to the front room and looked out the window. She asked the Defendant, "Who is this walking around your car?" The Defendant said, "What [do] you mean somebody [is] walking around the car?" Everyone in the apartment looked out the window. Ms. Banks saw an unfamiliar man walking around the car and talking on a cell phone. Ms. Banks returned to the living room, and the Defendant and one of the men with him went out the front door. Ms. Banks did not identify the man who followed the Defendant. Brittany closed the door. Ms. Banks heard talking outside the apartment, but she did not hear what was said. She stated, though, that before the door closed, she heard the man at the car say that the police had already been called. Ms. Banks also recalled that when she looked out the window as the Defendant and the man at the car were speaking, one of them had their hands up, although she was unable to recall which one.

A couple of minutes later, Ms. Banks heard two or three gunshots. Ms. Banks ran outside and looked over the balcony; she saw the man who had been walking around the car lying on the ground. She did not remember whether the man was face-up or face-down. A woman who had been with the man was standing outside the truck. The woman, who was also unfamiliar to Ms. Banks, said to call the police, and Ms. Banks ran inside to call 9-1-1. After calling the police, Ms. Banks stayed with Brittany, and the other women left with the children. The man who went outside with the Defendant left with him, and Ms. Banks did not know where the third man went.

Ms. Banks testified that she did not see the Defendant with a weapon that evening, although she saw him "fidgeting around" with something in his pocket. On July 31, 2016, Ms. Banks identified for police the locations of the car, the truck, and Brittany's building, which she marked on aerial photographs of the area. After reviewing her statement to police, Ms. Banks recalled that before the shooting, the Defendant told his friends that "he stay with a tool, ready to burn something." Ms. Banks understood that a tool referred to a gun and that the Defendant was "[r]eady to shoot." Ms. Banks also identified the Defendant in a photographic lineup during her police interview.

-9-

On cross-examination, Ms. Banks acknowledged that it was dark outside and that she did not see the shooting. She agreed that when the Defendant arrived at the apartment, there were two men accompanying him.

Mary Shoemaker testified that on July 30, 2016, she lived at Hickory Hills Apartments with her sister Brittany. Mary, Brittany, Ms. Banks, a woman named Ambrea, and six children were at the apartment that evening. Mary and the Defendant grew up together, and she identified him in the courtroom. The Defendant came to the apartment with another man, whom Mary did not know. Mary and the Defendant were talking in her bedroom when Brittany stated that she saw "some lights outside her window, blocking [the Defendant's] car[.]" The Defendant and his companion went outside to see what was happening. Mary had seen the Defendant driving a gold Infiniti one or two weeks previously. Mary heard "some commotion" and arguing, specifically someone saying the police were on their way. Mary had an outstanding warrant for driving without a license, so she got up to lock the apartment door. Before she reached the door, she heard two gunshots, after which she gathered her children and left. As they left the building, she saw a man lying on the ground, whom she had never seen before. Mary stated that before the shooting, she saw a gun handle sticking out of the left side of the Defendant's waistband. The day after the shooting, Mary gave a statement to the police when they contacted her at work. Mary identified the Defendant in a photographic lineup as the person who was in her house and who argued with the victim on the night of the shooting. She noted on the lineup that she had seen the Defendant carrying a gun. Mary testified that on the night of the shooting, a third man, whose nickname was Boo, was also present in the apartment; he stayed inside during the shooting, according to Mary.

On cross-examination, Mary testified that it was not unusual for the Defendant to visit her apartment. She noted that Ambrea was the Defendant's sister. Mary agreed that although she noticed the Defendant's gun, he did not display or brandish it during his visit.

Brittany Shoemaker testified that she was Mary's younger sister and Ambrea's cousin. Brittany had known the Defendant for twelve or thirteen years. In July 2016, Brittany lived in Hickory Hills Apartments with her child, Mary, and Mary's two children. On July 30, Brittany, Mary, Ambrea, Ms. Banks, and the children were getting ready to go downtown when the Defendant arrived with another man whom Brittany did not know, who was introduced to Brittany as "Booshawn" and later identified as Montrell Clark, and Ms. Banks's ex-boyfriend Darion Williams, whose nickname was "Boobie" or Boo. The three men arrived in a gold car, which Brittany had seen previously parked at Ambrea's house. Brittany noted that the Defendant was Ambrea's stepbrother. Brittany saw the Defendant adjusting a black gun handle at the hip of his pants. The men stayed

-10-

for about twenty or twenty-five minutes. Brittany went to her bedroom to continue doing her hair when she saw lights outside her window. She saw a man looking at the back of the gold car. Brittany called to the Defendant that a man was looking at his car. She asked, "What y'all got going?" The Defendant responded, "Nothing. We good." Brittany told the Defendant he had to leave, and the Defendant and Mr. Clark went outside; Brittany closed the door; and a "[c]ouple seconds later" she heard a gunshot. Brittany did not overhear any conversation after the Defendant left. Brittany looked out the window and saw a man lying on the ground, then she sat down and waited for the police to knock on her door. Mary, Ambrea, the children, and Mr. Williams went outside after the shooting.

Brittany identified the Defendant in a photographic lineup, indicating that his nickname was "Pookie," and she wrote a summary of the evening's events that was consistent with her trial testimony. She did not see who fired the shots. Brittany also marked an aerial map with the location of the gold Infiniti; the truck before the shooting; and the truck after the shooting. Brittany noted that after the shooting, a woman was outside the truck crying and asking for help.

On cross-examination, Brittany testified that when she saw the victim on the ground, she did so from the second-floor balcony, where Ms. Banks and Mr. Williams were standing. The crying woman was holding onto the driver's side door of the truck. Brittany denied that the Defendant was "showing the [gun] around" before the shooting.

Dr. Kevin Jenkins, Assistant Medical Examiner at the West Tennessee Regional Forensic Center and an expert in forensic pathology, testified that he conducted the victim's autopsy. He concluded that the cause of death was a gunshot wound to the head and that the manner of death was homicide. The victim had a "graze-type" gunshot wound to the back, as well as abrasions and lacerations to the skin on the left side of his face consistent with contact with a rough surface like asphalt or concrete. The fatal wound was a gunshot to the right side of the head. The bullet entered at the middle part of the right eye and "went mostly straight backwards, slightly upwards," exiting at the back of the head. The length of the right side of the brain and the skull were injured, and Dr. Jenkins noted hemorrhaging in the right side of the brain and along the track of the bullet. The gunshot would have immediately caused death. Dr. Jenkins did not find any soot, stippling, or muzzle imprint on the victim, indicating that the shot was fired from "somewhere greater than inches . . . to three feet." Dr. Jenkins noted that the victim's blood tested positive for marijuana and metabolites of marijuana, although it was outside of his area of expertise to give an opinion on any possible effect on the victim from the amount of marijuana present in his blood.

On cross-examination, Dr. Jenkins testified that he responded to the crime scene and that the victim was on his back when Dr. Jenkins arrived. Dr. Jenkins agreed that the

abrasions on the victim's face could have been caused by the victim's falling down face-forward. Upon examination by the trial court, Dr. Jenkins agreed that it was possible the victim could have been turning as he fell. He also agreed that the injuries to the victim's face were consistent with "someone who didn't put their hands up" to break the fall. He recalled that the victim was holding a cell phone in his left hand.

On recross-examination, Dr. Jenkins testified that it was not unusual for a decedent to maintain a grip on an object after almost instantaneous death, explaining that some muscles spasm at death and if a person was grabbing something, the muscles would not release. He acknowledged that "that can work in the . . . opposite way" and agreed that if the victim had dropped the cell phone, it also would not have been unusual.

During the motion for a judgment of acquittal, the Defendant argued that the evidence was insufficient as to premeditation and that the underlying theft of the car was too distant in time to be considered the basis for felony murder. The State responded relative to felony murder that "the theft alleged in this indictment [was] the theft on July 30th, 2016." The prosecutor noted that the victim notified the Defendant that the car was stolen and that was when the murder occurred. The trial court denied the motion, noting that the victim "reacquired possession and was holding the car there, waiting for the police, had the keys, . . [and] let himself in the driver's door . . . . And the [D]efendant then, for a second time, took that property."

Darion Williams testified for the defense that he knew the Defendant through Mr. Williams's cousin and that on July 30, 2016, around 7:00 or 8:00 p.m., the Defendant picked up Mr. Williams. They were going to Brittany's apartment to pick up Mr. Williams's four-year-old son. A man nicknamed Booshawn was also in the car. After arriving at the apartment and going inside, Mr. Williams was waiting for his son to gather his belongings when "somebody hollered out [that] somebody was behind the car and had the car blocked in." Mr. Williams told the children to get away from the windows and go to a back room, and the Defendant and Booshawn went outside. Mr. Williams went out to "the second flight of steps" and saw the Defendant and the man having "a little altercation." Mr. Williams stated that the two men were about to fight and that the Defendant was trying to "grab . . . open the door [when the victim] slapped his hand and pushed him back." Mr. Williams said that both men "got to reaching," meaning that they reached for their weapons, and Mr. Williams heard two gunshots.

Mr. Williams testified that he could not hear any conversation between the men and that he was about ten to fifteen feet away from them on the balcony. The Defendant was facing Mr. Williams. Mr. Williams "couldn't tell" when they pulled their guns, but he "just [saw] . . . once they stepped back from each other." He clarified that he did not see either the Defendant or the victim with a gun, but due to their body movements, he could tell "that it was something happening." Mr. Williams saw the victim fall "straight

-12-

back."  After the gunshots, Mr. Williams saw a woman, who was sitting in the passenger's seat of a truck that was blocking the car, slide into the driver's seat and back up the truck.  The Defendant and Booshawn drove away, and the woman exited the truck and stood over the victim's body.  Mr. Williams did not recall what the woman did after that, stating that he was "in shock" and walked back into the apartment.  Mr. Williams took Brittany's car and drove away with the children.

On cross-examination, Mr. Williams testified that he saw "some bumping back and forth" between the victim and the Defendant, although he denied hearing any yelling.  The prosecutor played the 9-1-1 recording for Mr. Williams, and he denied having heard the victim's statements on the recording.  Mr. Williams acknowledged that he had a cell phone and did not help the victim or call 9-1-1.  He noted that the women in the apartment said that they would call the police.  When asked whether he went to check on the Defendant, Mr. Williams responded that the Defendant was gone.  Mr. Williams acknowledged that he never spoke to the police and that his testimony was the first time he was "telling anybody about this."  Mr. Williams did not know how long the Defendant had driven the gold Infiniti, and the evening of the shooting was the first time Mr. Williams had been in that car.

The Defendant testified that he worked as a mechanic and that on July 30, 2016, he drove a 1997 Infiniti i30.  He bought the car on July 12, 2016, from a Craigslist seller for $800 and noted that the car was not running when he purchased it.  The Defendant had the keys to the car.  On July 30, he picked up Mr. Williams and later picked up Mr. Clark to go to a party.  Mr. Williams asked if they could go get his son at Hickory Hills Apartments, where the Defendant also intended to visit his sister.  They arrived at about 8:45 or 9:00 p.m. and went inside.  The Defendant had a gun on his "right side waistband" because he was carrying cash that evening and wanted to protect himself.

After about fifteen minutes, Brittany noticed some lights and told them that a man, later identified as the victim, was "circling around" and had blocked in the car.  The Defendant went outside, followed by Mr. Clark, who stood at the passenger's side of the car at the front bumper.  The Defendant asked the victim what he was doing, and the victim responded that he "came to get his car" and that it had been reported stolen.  The Defendant stated that the car was his, and the victim said he was not leaving without the car.  The Defendant asked if he could retrieve his belongings from the car, and the victim told him no.  When the Defendant tried to open the door, the victim pushed the Defendant's arms.  The Defendant pushed the victim in his chest.  The Defendant estimated that the back and forth between him and the victim lasted about three minutes.  When asked whether the victim opened the driver's side door, the Defendant responded, "I didn't see him.  I didn't see that part, where he opened the door."  The Defendant agreed that the "tussle" occurred when the Defendant tried to open the driver's side door.

-13-

The Defendant slid toward the back of the car, and the victim saw the gun in the Defendant's waistband. The victim was on the telephone with the police and said, "Don't shoot me, don't shoot me" as the victim "went in his pocket for his weapon[.]" The Defendant drew his gun and fired.

The Defendant testified that he panicked and got in the car with Mr. Clark. A young woman in the truck backed it up, and the Defendant drove to the end of the parking lot. When the Defendant realized he did not have his cell phone, he ran back to the victim's body and picked up his cell phone from the ground next to the body. The Defendant returned to the car, dropped off Mr. Clark, and went to his parents' house. The Defendant's father asked why he left the crime scene, and the Defendant responded that he was scared. The Defendant noted that he had never "be[en] in a situation like that before." Around 10:45 p.m., the Defendant and his father went to the home of the Craigslist seller. The seller refunded the Defendant $500; the Defendant gave the seller the car back; and that was the last time the Defendant saw the car. The Defendant told the seller that "a guy came to me about the car and said the car was stolen. And a shooting happened about this car." The Defendant spent the night with Mr. Williams.

The Defendant testified that he was unaware the police were looking for him and that he asked his sister if the police wanted to speak to him. She responded negatively, so the Defendant went to Mississippi. At some point later, the Defendant turned himself in "for a bench warrant" in Mississippi. When asked why he shot the victim, the Defendant said that he was scared, that both men had guns, that the Defendant had been shot before and did not wish to be shot again, and that he did not want to lose his life. The Defendant stated that the victim had a gun in his right pocket and held the gun in his right hand. The Defendant agreed that the gun photographed next to the victim's body was the gun he saw that night. When asked why he did not render aid to the victim or call 9-1-1, the Defendant said that he panicked and left the scene. The Defendant testified that he went to the apartment complex to pick up Mr. Williams's son, that he was not looking for "trouble" or "a confrontation," and that he had not been concerned about the car.

On cross-examination, the Defendant testified that he did not remember the name of the Craigslist seller, although he remembered that he bought the car at "Sterlings Apartment." The Defendant stated that he had the title and that he gave the title back to the seller along with the car. The Defendant was armed when he left his home at 3:00 p.m. on the day of the shooting. He explained that although he generally did not carry a gun, that day he had almost $5,000 cash on him. When asked where he got $5,000 cash, he responded that he did auto body work and that one week before the shooting, he "did a custom paint job" on a 2002 Ford Mustang, for which he earned $1,800; he painted "some wheels" for $500; and he painted another friend's car for $2,700. He stated that his customers paid him in cash. He agreed that his work was "under the table" and that

he did not pay taxes on his earnings. The Defendant kept his cash in a safe in his house. On July 30, 2016, he had $7,200 in the safe, and he removed $5,000 in order to buy another car. The Defendant noted that he bought, sold, and traded cars in addition to his auto body work. The Defendant intended to buy another Infiniti on the morning of July 31 and was planning on spending the night at Mr. Williams's house on July 30 so that Mr. Williams could drive one of the cars after the purchase was completed. The Defendant stated that he was going to buy the Infiniti from a man named Lee who owned "K&J's Automotive."

The Defendant acknowledged that he had prior convictions for "[c]onvicted felon in possession of a handgun, forgery $1,000 or less, theft $500 or less, and [he was] placed on diversion for a burglary." His prior diversion had been revoked and the conviction for burglary had been reinstated. The Defendant agreed that he was not supposed to carry a gun as a result of these convictions and that he previously was "doing the same exact thing that [he was] doing here that [he was] not supposed to be doing." The Defendant said, though, that his other conviction for possessing a handgun occurred in Mississippi when he was in a car with another person who was carrying a handgun. He stated that this was the first time he actually carried a gun and denied carrying a gun "a lot." The Defendant also denied that when the law or a judge told him not to do something, he did what he wanted regardless.

The Defendant testified that he bought the handgun in this case illegally from one of his customers. When the Defendant arrived at Hickory Hills Apartments, he talked with his sister Ambrea, Mr. Williams, Mary, Ms. Banks, and the children, who were all in Ambrea's bedroom. Brittany was in her bedroom, which had windows facing the parking lot. When Brittany told the Defendant she saw someone at his car, she asked if the car was stolen. The Defendant did not know why she would ask him that and agreed that it was a "random question." When the Defendant went outside to speak to the victim, his gun was in a holster on his waistband. The Defendant stated that the holster was designed such that he could "pull [the gun] right out." His cell phone was on a clip on the same side of his waistband. The Defendant asked the victim what he was doing, and the victim responded that he had come to get his car, which had been reported stolen. The Defendant asked the victim, "[H]ow could the car belong to you when it belong[s] to me[?]" The victim said that he was on the phone with the police. The victim held the phone a couple inches away from his ear as he spoke to the Defendant, then placed the phone back to his ear and spoke to someone else. The Defendant told the victim that he would wait for the police to arrive but that he wanted to remove his belongings from the car. The Defendant had a tool set in the backseat of the car. The victim refused to allow the Defendant to retrieve the tool set, so the Defendant told the victim that he could not leave with the car.

The Defendant described the relative positioning of the parties during the altercation. The victim stood on the driver's side of the car between the front and rear doors, neither of which was open. The Defendant was "between the car" next to the apartment steps. The Defendant approached the front driver's side door and "went for the door handle" while saying he needed to retrieve his belongings. The victim pushed the Defendant's arms and the Defendant pushed the victim. The victim saw the Defendant's gun and reached for his own gun. The Defendant then pulled out his gun and shot the victim. When asked what he thought would happen to the tool set when the police arrived, the Defendant responded that he did not know. The Defendant noted that he did not have receipts for his belongings with him. The Defendant stated that the car title was at his house. When the Defendant left the scene, he tried to call his mother, but she did not answer.

When asked whether the Defendant and the victim were "just pushing each other for three minutes," the Defendant responded that "it probably wasn't exactly . . . three minutes. It seemed like three minutes because . . . how long that we [were] out there." The Defendant stated that the victim pushed him against the car and that the Defendant was not injured. The Defendant agreed that the victim "[was] saying that [the Defendant didn't] have to do this." The Defendant stated that after the victim pushed him, the Defendant slid to the back of the car such that his back was facing the truck and he was facing the apartment complex. The victim was standing "on the opposite side where [the Defendant] was standing . . . at first," although the Defendant also said that they were standing beside one another. The driver's side door was cracked open. The Defendant agreed that the victim was telling the Defendant not to shoot him while the Defendant's gun was still holstered.

The Defendant did not remember how many times the victim said "[d]on't shoot me" before the Defendant fired, although he recalled that the victim was still talking. The Defendant fired twice. He acknowledged that he was not shot during the altercation. The Defendant hypothesized that the bullet that grazed the victim's back may have hit him as he fell to the ground. The Defendant stated that after he shot the victim, he was "still in [a] panic" and afraid of being shot. He acknowledged, though, that the victim did not speak or do anything after he fell to the ground. The Defendant indicated that he had no choice but to shoot the victim and that his shooting the victim was justified. The Defendant stated that the victim drew his gun before the Defendant shot him. The Defendant agreed that he quickly drove away and did not think to stay and wait for the police. When the Defendant reached the end of the apartment driveway, within one or two minutes, he realized he forgot his cell phone. The cell phone was next to the victim's body. The Defendant agreed that he did not call the police or an ambulance; however, his cell phone "was important enough for [him] to go back and pick it up." The Defendant

denied that he went back to "pick up any evidence[.]" The Defendant acknowledged that he never told the police his version of events, although he stated that he told his parents.

The Defendant testified that after he arrived at his father's house, his father asked him if he still had the Craigslist seller's information. The Defendant noted that he was "still panicking" but agreed that he was calm enough to want to "get rid" of the car. The seller denied knowing the car had been stolen. The Defendant agreed that even though he was certain he bought the car legally, he returned the car based solely upon the victim's word that it was stolen. The Defendant stated that although he did not know whether to believe the victim, he no longer wanted the car. The Defendant agreed that after being informed that the car had been involved in a shooting, the seller refunded the Defendant $500 and took the car. They did not converse further. The Defendant denied burning the car and maintained that it was a "coincidence." The Defendant stated that the seller had to have burned it.

At the conclusion of the Defendant's proof, the trial court noted relative to lesser-included offenses of count two, felony murder, that it would charge "the statutory lesser of second degree murder . . . [and] voluntary manslaughter. But I'm not going to charge below that." The following morning, defense counsel renewed his request to include reckless homicide and criminally negligent homicide as lesser-included offenses of felony murder. The court responded,

> I understand your request, but from the felony murder count, based upon the proof that I've heard, I don't see where a jury – a reasonable jury would conclude that the defendant acted in a reckless or negligent manner when he committed the killing or the theft. So I just don't think . . . it's reasonable for a jury . . . [to] come back with those verdicts, so I'm going to stop at voluntary [manslaughter].

The Defendant was thereafter convicted as charged.

At the sentencing hearing, the court found that the Defendant was on probation at the time of the offenses. The trial court merged Count 2, felony murder, into Count 1, first degree premeditated murder, and imposed a statutory life sentence. Relative to the Defendant's criminal history, a collective exhibit reflected that on July 6, 2017, in Desoto County, Mississippi, the Defendant pled guilty to "felon in possession of a weapon: handgun." He was sentenced to one year with nine months' post-release supervision. The presentence report reflected that the Defendant was age twenty-four and had the following adult convictions in Shelby County: felony forgery; misdemeanor vandalism; two separate convictions of misdemeanor theft; misdemeanor forgery; and burglary other than a habitation. The Defendant's juvenile record included adjudications for being a juvenile in possession of a handgun, violation of curfew, felony evading arrest, leaving

-17-

the scene of an accident, reckless driving, and aggravated assault. The Defendant had also been adjudged dependent and neglected at age five and placed in protective custody at age three. The Defendant had a twelfth-grade education and reported using marijuana socially beginning in high school. He reported having been diagnosed with attention deficit hyperactivity disorder (ADHD), for which he did not currently take medication. Until his arrest, the Defendant had been working as an auto mechanic. A "Strong-R" risk assessment conducted on June 4, 2018, found that the Defendant was at moderate risk to reoffend relative to education and residential factors, and at high risk due to mental health factors.

Sharon Williams, the victim's mother, gave a victim impact statement. She stated that the victim was the middle child of three siblings. He was age twenty-six at the time of his death. Ms. Williams gained custody of the victim's then-eight-year-old son. Ms. Williams stated that she could "see the hurt" in the victim's son, that he attended counseling because he began to "act out so bad," and that it hurt the victim's son to see other children with their fathers. The counselor told Ms. Williams that the victim's son had "attachment issues." She stated that the victim's son comforted her when she had difficult days, but he should not have to worry about her. Ms. Williams noted that the victim's son became upset when she had health problems because she and her husband were all the victim's son had.

Ms. Williams noted that the day of the sentencing hearing was the victim's twenty-eighth birthday, which was particularly difficult. She stated that the last time she spoke to the victim was on her birthday on July 27 and that she now dreaded the month of July. Ms. Williams said that she had survived two heart attacks, thyroid cancer, and kidney issues, and that she was unprepared for the pain of losing a child. She stated that she was also seeing a counselor and that she was "never happy." Ms. Williams described the victim as "[her] heart" and as a good person who always made her laugh and would help wherever he was needed. Ms. Williams noted that she taught all her children to look out for others. She stated that the loss of the victim was "truly killing [her]." Ms. Williams stated that the victim's son was the victim's "twin" and all she had left of the victim. Ms. Williams asked the court to impose the maximum sentence. She said to the Defendant, "You took a good person that would have given you anything, all you had to [do was] ask . . . . He didn't deserve that."

Ebony Stanford, the victim's aunt, also gave a victim impact statement. Ms. Stanford said that the victim's death had been "devastating" to their very close family, that the victim had been like a son to her, and that their family had not been the same since the victim's death. She said that they had "a lot of sleepless nights." She described the victim as a "very good person, just very free-hearted. He would do anything he could for you." Ms. Stanford stated that the victim could not be replaced. She recalled the

victim's funeral, where his son asked, "[W]hy did they have to kill my daddy?" Ms. Stanford noted that the victim's son and the family did not previously know why the victim had stitches around his eye at the funeral. She said that the family was "heartbroken" and that although they were trying to move forward, their family dynamics would never be the same. Ms. Stanford asked the court to impose the maximum sentence.

Caprecia Green, the victim's aunt and Ms. Williams's sister, also gave a victim impact statement. Ms. Green said the victim's death was "devastating" and that she recalled receiving the news of the victim's death while at work. Ms. Green's son was close to the victim, and the victim spent summers with Ms. Green's family. Ms. Green described the victim as "one of the most kind-hearted people that a person could ever meet." Ms. Green stated to the Defendant, "God has promised us in his word that [what] you have sowed, you will reap."

The trial court noted that it also considered the written victim impact statements submitted by the State, which included statements from the victim's grandparents, Ms. Green, and Ms. Stanford. The court stated that it considered the principles of the Sentencing Act and the Defendant's social and criminal history as set out in the presentence report. The court noted that Counts 1 and 2, as merged, carried a life sentence by operation of law.

Relative to Count 3, theft of property valued at over $1,000, the court found that the Defendant was a Range II, multiple offender. The court imposed a sentence of six years. The court found relative to all the convictions that the Defendant had a history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; that the personal injury to the victim and the damage inflicted on his property was particularly great; that the Defendant failed to comply with conditions of a sentence involving release into the community, namely probation; that the Defendant had no hesitation about committing a crime when the risk to human life was high; and that the Defendant was on probation when the offense was committed. See Tenn. Code Ann. § 40-35-114(1), (6), (8), (10), (13)(C).

Relative to Count 4, attempt to commit especially aggravated robbery, the court found that because the offense was a Class B felony, for purposes of this conviction the Defendant was a Range I, standard offender. Based upon the enhancement factors present, the court sentenced the Defendant to twelve years.

Relative to Count 5, unlawful possession of a handgun by a convicted felon, the trial court found that the Defendant was a Range II multiple offender. The court imposed the maximum sentence of four years.

Relative to consecutive sentencing, the court found that the Defendant was on probation at the time the offenses were committed. See Tenn. Code Ann. § 40-35-115(b)(6). The court ordered Count 3 to be served consecutively with Count 1, Count 4 to be served consecutively to Count 3, and Count 5 to be served concurrently with Count 4. The sentences in Counts 3, 4, and 5 were also to run consecutively to the violation of probation in his previous case. The total effective sentence was life plus eighteen years.

At the motion for a new trial, the Defendant raised the sufficiency of the evidence for all five convictions. However, the only specific grounds raised were premeditation relative to Count 1 and the distant nature of the theft in Count 2. After finding that sufficient proof of premeditation existed and that the theft underlying Count 2 was the second theft of the car after the victim was shot, the trial court discussed Count 3, attempt to commit especially aggravated robbery, as follows:

> The [c]ourt is also satisfied as to the especially aggravated robbery. Again, I think taking that car under those circumstances, he had possession of his vehicle [and] the [D]efendant took it by force, violence, putting the victim into fear . . . . He took it through use of a deadly weapon, by putting the person in fear and by violence and causing serious bodily injury.

> So the [c]ourt is satisfied that that is an especially aggravated robbery. And again, it's a separate – the murder during the perpetration of a theft and the especially aggravated robbery are independent of each other and can lead to separate convictions.

> Felony murder and the underlying conviction for the underlying felony have been found by the State of Tennessee, the [s]upreme [c]ourt to be separate distinct offenses and can be sentenced, separately, and the [c]ourt will do that.

The Defendant also raised the trial court's denial of his request to instruct the jury on the lesser-included offenses of reckless homicide and criminally negligent homicide relative to the felony murder charge. The court found that voluntary manslaughter could not have been argued because no evidence existed of provocation from the victim.[7] Relative to reckless homicide, the court found that "this was an intentional act, not an accident . . . or a gross deviation from reasonable care." The court found relative to consecutive sentencing that it was supported by the facts and that the court had "been provided nothing to indicate that that was wrong." The court denied the motion, and the Defendant timely appealed.

---

[7] We note that voluntary manslaughter was ultimately charged as a lesser-included offense of felony murder.

# ANALYSIS

## I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions for first degree premeditated murder, felony murder, and attempt to commit especially aggravated robbery. The Defendant argues (1) that premeditation was not sufficiently proven because the Defendant's testimony established that he acted in self-defense or recklessly; (2) that the theft underlying felony murder occurred three weeks before the killing and the State did not prove the Defendant stole the car; and (3) that the evidence was insufficient to find that the Defendant intended to "commit aggravated robbery" and that the Defendant's theft conviction is contradictory to his being guilty of attempt to commit especially aggravated robbery. The State responds that the evidence is sufficient.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this

-21-

court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

### a. First degree premeditated murder

The Defendant argues that the evidence of premeditation was insufficient because he did not make a verbal declaration of his intent to kill the victim, make preparations for the killing, or show calmness immediately after the killing. The Defendant cites his testimony that the victim had also drawn a gun and that he was afraid for his life, as corroborated by the presence of the gun next to the victim's body.

First degree premeditated murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). "Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." Davidson, 121 S.W.3d at 614-15.

A self-defense instruction was also given in this case. In Tennessee, a person who is not engaged in unlawful activity may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2). If the person was engaged in unlawful activity, there is a duty to retreat before using deadly force. See State v. Perrier, 536 S.W.3d 388, 394-401 (Tenn. 2017). It is well established, under Tennessee law, "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)).

In the light most favorable to the State, the evidence of premeditation was overwhelming in this case. Before the shooting, Ms. Banks heard the Defendant state that he was armed and "ready to burn something," which indicated that he was ready to shoot. Ms. Gray and Mr. Lawson testified that the victim did not draw a gun or make physical contact during the altercation, and the 9-1-1 recording reflects that the victim repeatedly begged for his life before being shot. The Defendant did not attempt to aid the victim and instead fled the scene.

The jury, by its verdict, discredited the Defendant's testimony that he fired on the victim in self-defense. We note the trial court's finding that the Defendant, a convicted felon, was not acting lawfully at the time of the shooting and, therefore, had a duty to retreat before acting in self-defense. The jury was instructed on the duty to retreat. No evidence indicated that the Defendant made a meaningful attempt to retreat or disengage with the victim before shooting him.

Moreover, after beginning to flee, the Defendant stopped the victim's car and walked back to the victim's body. The State's theory was that the Defendant then turned out the victim's pocket, thereby attempting to commit especially aggravated robbery, and later set the car on fire to destroy evidence. The Defendant's theory was that he recovered his dropped cell phone and later sold the car back to the Craigslist seller, who burned the car. By either set of facts, the Defendant's presence of mind immediately after killing a person belies his argument that he was not calm after the killing. The Defendant is not entitled to relief on this basis.

*b. First degree felony murder*

As relevant to this case, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate . . . [a] theft[.]" Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction" of first degree felony murder, "except the intent to commit the enumerated" offense. Tenn. Code Ann. § 39-13-202(b). Theft occurs when a person, "with intent to deprive the owner of

-23-

property, . . . knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103.

"The felony murder rule applies when the killing is 'done in pursuance of the unlawful act, and not collateral to it.'" State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956)). Nonetheless, "[t]he killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." Id. (internal quotation marks omitted) (quoting State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)). The jury "may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. (internal quotation marks omitted) (quoting Buggs, 995 S.W.2d at 106).

The Defendant's argument consists entirely of the assertion that the theft underlying felony murder was the theft of the victim's car on July 9, 2016, making the murder too distant in time to be connected to the underlying felony. However, the State consistently argued at trial, and the trial court noted, that the theft referred to in the indictment was the second theft of the victim's car, not the first. In the light most favorable to the State, the evidence at trial showed that the victim had used his spare key to the car to open the front driver's side door, thereby reacquiring control over the car. Immediately after the Defendant shot the victim, he and Mr. Clark drove away in the car, depriving the victim of the property without his consent. The second theft of the car was sufficiently connected to the killing such that it could form the basis of felony murder. The Defendant is not entitled to relief on this basis.

*c. Attempt to commit especially aggravated robbery*

Especially aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). As stated above, theft of property occurs when, "with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). As relevant here, criminal attempt is committed when a defendant acts "with the kind of culpability otherwise required for the offense" and "with [the] intent to cause a result that is an element of the offense," and the defendant "believes the conduct will cause the result without further conduct on the [defendant's] part." Tenn. Code Ann. § 39-12-101(a)(2).

-24-

The Defendant argues that "no evidence exists to support a finding that the Defendant . . . intended to commit aggravated robbery" because he was in fear for his life when he shot the victim. The Defendant further argues that he

> was charged and convicted of theft of property and criminal attempt [to commit] especially aggravated robbery. He was convicted of theft of property indicating the jury believed the Defendant had possession and control of the vehicle. The fact that the Defendant was found guilty of "criminal attempt" is contradictory to the finding of guilt regarding theft of property. It infers that the jury did not believe the Defendant completed the crime of aggravated robbery, which indicates that the jury rested the theft of property charge on the fact that the Defendant was in possession of the vehicle, not his actions regarding the shooting on July 30, 2016.

We note that at the motion for a new trial hearing, the trial court mistakenly focused its discussion of Count 3 on the theft of the car, rather than personal property, which was the specified target of the robbery in the indictment. Although an indictment could have been sought for especially aggravated robbery rather than theft related to the car, Count 3 states that the target of the robbery was "personal property." The State's theory for Count 3 was based upon the victim's right pocket being turned inside out, indicating that the Defendant went through the victim's pockets, impliedly with the intent to steal something from him.

Notwithstanding the Defendant's murky argument and the trial court's confusion of the two thefts, the evidence was sufficient for a reasonable trier of fact to find that the Defendant returned to the victim's body after the shooting, stood over him, and turned out the victim's pants pocket in an attempt to take something out of that pocket. The Defendant is not entitled to relief on this basis.

## II. Lesser-Included Offense Jury Instructions

The Defendant contends that the trial court abused its discretion when it declined to instruct the jury on the lesser-included offenses of reckless homicide and criminally negligent homicide relative to the felony murder charge. The Defendant argues that in making its determination, the trial court did not "view the evidence in a light most favorable to the existence" of the lesser-included offenses. The State responds that any error was harmless.

"Whether the trial court properly instructed the jury on a certain offense is a mixed question of law and fact," which we review de novo with no presumption of correctness. State v. Howard, 504 S.W.3d 260, 267 (Tenn. 2016). A trial court must instruct the jury on a lesser-included offense if it "determines that any evidence as to a lesser-included

offense exists that reasonable minds could accept <u>and</u> that the evidence, viewed liberally in the light most favorable to the lesser-included offense, is legally sufficient to support a conviction." <u>Id.</u> at 268; <u>see</u> <u>State v. Burns</u>, 6 S.W.3d 453, 469 (Tenn. 1999). "The failure to instruct the jury on lesser[-]included offenses requires a reversal for a new trial unless a reviewing court determines that the error was harmless beyond a reasonable doubt." <u>State v. Thomas</u>, 158 S.W.3d 361, 379 (Tenn. 2005) (citing <u>State v. Ely</u>, 48 S.W.3d 710, 727 (Tenn. 2001)). A harmless error determination in this context includes a "thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." <u>State v. Allen</u>, 69 S.W.3d 181, 191 (Tenn. 2002).

Reckless homicide is defined as "the reckless killing of another." Tenn. Code Ann. § 39-13-215(a). "Reckless" means that a person

> acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. §§ 39-11-106(a)(33), -302(c).

Criminally negligent homicide is defined as "[c]riminally negligent conduct that results in death." "Criminal negligence" refers to

> a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. §§ 39-11-106(a)(5), -302(d).

Our supreme court has previously held that second degree murder, reckless homicide and criminally negligent homicide are lesser-included offenses of felony murder. <u>State v. Ely</u>, 48 S.W.3d 710, 721 (Tenn. 2001).

In this case, in Count 2, felony murder, the trial court instructed the jury on second degree murder and voluntary manslaughter, but it declined to give instructions on reckless homicide and criminally negligent homicide, finding that a reasonable jury could not conclude that the Defendant's actions were less than intentional. However, relative to Count 1, first degree premeditated murder, the court in fact instructed the jury on the same lesser-included offenses it declined to give in Count 2, reckless homicide and criminally negligent homicide.

We conclude that the trial court erred by not instructing the jury on reckless homicide and criminally negligent homicide relative to felony murder. The key issue in this case was the Defendant's mental state, and the trial court should have instructed the jury on offenses reflecting various levels of culpability. The eyewitnesses established that a conversation between the victim and the Defendant took place regarding the stolen car and that the Defendant shot the victim, killing him. The Defendant did not argue that he did not shoot or kill the victim, but rather that he shot the victim because the victim had also drawn a gun and the Defendant was afraid for his life. The Defendant stated in closing that he was not guilty because he acted in justifiable self-defense and, alternatively, that he was guilty of "at most" reckless homicide. Cf. Thomas, 158 S.W.3d at 380 (concluding that failure to instruct on lesser-included offenses of felony murder was harmless, in part, because the defendant "did not concede that he was involved in the crime, and he did not argue that he was guilty of a lesser-included offense or attempt to establish that he was guilty of a lesser-included offense."). A small black pistol was found next to the victim's body, and various police witnesses testified regarding the gun's positioning. Evidence existed that reasonable minds could accept as to the lesser-included offenses. Similarly, the evidence was sufficient to support either a conviction for reckless homicide or criminally negligent homicide. We note that "simply because the evidence is sufficient to support a conviction for the greater offense does not excuse the failure to instruct on a valid lesser-included offense." State v. Locke, 90 S.W.3d 663, 670 (Tenn. 2002). We further note that the evidence supporting the lesser-included offense instructions for premeditated murder likewise supported the same lesser-included offense instructions for felony murder.

However, we conclude that the failure of the trial court to instruct the jury on reckless homicide and criminally negligent homicide relative to felony murder was harmless beyond a reasonable doubt. The jury was properly instructed on all lesser-included offenses in Count 1, first degree premeditated murder, including reckless homicide and criminally negligent homicide. The jury's guilty verdict in Count 1 entailed finding that the Defendant acted with premeditation, rejecting that the Defendant acted recklessly or in self-defense. These two factual findings would also apply to Count 2. In addition, in Count 2, the jury had as available options second degree murder and voluntary manslaughter, the two most immediate lesser-included offenses of felony

murder, and still found the Defendant guilty as charged. See State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998) (holding that failure to instruct on voluntary manslaughter in first degree murder case was harmless error because second degree murder was instructed and "by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter"). We note that the evidence of the Defendant's guilt of both the murder and the underlying theft of the victim's car was overwhelming and that the Defendant was also convicted of theft relative to the car. The Defendant is not entitled to relief on this basis.

## IV. Consecutive Sentencing

The Defendant contends that the trial court erred by imposing consecutive sentences, arguing that "the analysis required to allow or support [the] imposition of consecutive sentencing was not followed" and that the total effective sentence was "greater than that deserved for the offense committed" and "not justly deserved in relation to the seriousness of the offense." See Tenn. Code Ann. §§ 40-35-102(1), -103(2). The State responds that consecutive sentencing was proper.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

It is unclear to which statutory grounds the Defendant alludes in his argument, as no particular procedure is required in imposing consecutive sentences other than making the proper factual findings. The trial court clearly articulated that it based consecutive sentencing in this case on the Defendant's being on probation at the time the offenses were committed. This ground alone was a sufficient basis for the imposition of consecutive sentencing. Pollard, 432 S.W.3d at 862; Tenn. Code Ann. § 40-35-115(b)(2).

In addition, a total effective sentence of life plus eighteen years is not disproportionate in relation to the seriousness of the offenses. The evidence at trial showed that the Defendant confronted the victim and, in response to the victim's assertion that the car was his, drew his gun; without provocation and as the victim begged for his life, shot the victim twice; stole the victim's car; returned in order to go through the victim's pockets; did not attempt to aid the victim; fled from police and eventually

fled the state; and either destroyed the victim's car or arranged for its destruction. A sentence of life plus eighteen years is justly deserved in relation to the seriousness of these offenses. We note that the court ordered concurrent service of the sentence for unlawful possession of a firearm. The trial court did not abuse its discretion in ordering consecutive sentencing in this case. The Defendant is not entitled to relief on this basis.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE